\* \* \* then all the plaintiff has to do is to frame a bare and lean complaint showing that he is entitled to an accounting. Then the course is open to obtain an interlocutory judgment that the plaintiff file an account. The practice following that is equally familiar to the profession. The plaintiff wants to get the account before he serves a complaint."

There are certain fundamental differences between the examination of an adverse party after issue has been joined to obtain evidence for use upon the trial to sustain a cause of action and the examination of a proposed adverse party to enable a person to obtain information in order to frame a complaint. Decisions upon applications for examinations to obtain evidence to be used upon the trial are not necessarily authoritative upon applications for examinations to enable the framing of a complaint. The Goldmark Case, 111 App. Div. 526, 77 N. Y. Supp. 197, presented the question of the examination of the adverse party after issue joined to be used upon the trial, and, while that case swept away a mass of technical interpretations which had almost throttled the beneficent purposes of the statute, nevertheless this court said:

"The rule that the affidavit must state the facts and circumstances to show that the deposition of the proposed witness is material and necessary to the party making the application is intended to prevent an abuse of the permission to examine an adverse party; so that a party to an action will not be allowed to examine his opponents for an ulterior or improper purpose."

So that, where the affidavit discloses information sufficient to enable the party to frame his complaint for an accounting, an application, which in effect requires that accounting before issue joined, is evidently for an ulterior and improper purpose, because entirely unnecessary.

The order appealed from should be reversed, with $10 costs and disbursements, and the motion to vacate the order for the examination granted, with $10 costs. All concur.

---

LAMB v. UNION RY. CO. OF NEW YORK CITY.

(Supreme Court, Appellate Division, Second Department. March 11, 1908.)

1. EVIDENCE—PRESUMPTIONS AGAINST SUICIDE—INJURY TO PERSON BY STREET CAR.
   While there is no presumption that a pedestrian killed by a street car was careful, there is a presumption that he did not commit suicide.

2. STREET RAILROADS—INJURY TO PEDESTRIANS—CONTRIBUTORY NEGLIGENCE—QUESTIONS FOR JURY.
   Deceased was walking south on a public footpath between the rails of defendant's track, and was struck by a south-bound car, which came upon him from behind. It was customary to run north-bound cars exclusively on this track and south-bound cars on the track on the opposite side of the street; but there was no evidence that deceased knew of a temporary change in the custom. *Held*, that deceased was not bound as a matter of law to observe any special care to discover cars coming upon him from behind, and the question of contributory negligence was one of fact for the jury.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Street Railroads, §§ 251-257.]

Appeal from Trial Term, Westchester County.

Action by Sadie Lamb, as administratrix, etc., of Michael Lamb, deceased, against the Union Railway Company of New York City. From a judgment for defendant, plaintiff appeals. Reversed.

Argued before JENKS, HOOKER, GAYNOR, RICH, and MILLER, JJ.

Sydney A. Syme, for appellant.
Bayard H. Ames, for respondent.

MILLER, J. This is an appeal from a judgment entered upon a nonsuit granted at the close of the plaintiff's evidence in an action brought to recover damages for negligently causing the death of the plaintiff's intestate. At about 8:30 o'clock on the night of October 20, 1906, the deceased was run over and killed by one of the defendant's trolley cars on Webster avenue in the city of Yonkers, at a place about half a mile south of the Harlem River Railroad station in West Mt. Vernon. There is no direct evidence of the exercise of any care whatever on the part of the deceased, and the plaintiff was nonsuited for failure to prove freedom from contributory negligence. I will therefore undertake to summarize such facts and circumstances as I think the jury might have found by adopting the inferences most favorable to the plaintiff.

At the place of the accident Webster avenue runs north and south. The defendant has two tracks on opposite sides of the street; the north-bound track on the east side, the south-bound on the west side, with the wagon track between. There is no sidewalk on either side of the street; but at the time of the accident there was a footpath between the rails of the north-bound track on the east side of the street, and pedestrians usually walked there. It was the defendant's custom to run north-bound cars exclusively on the east side, and south-bound cars on the west side. A quarter of a mile north of the place of the accident,. Yonkers avenue runs into Webster avenue from the west. A sewer was being laid in Yonkers avenue, the excavation at the point of intersection of the two streets obstructed the defendant's south-bound track on the west side of Webster avenue, and because of that obstruction the north and south bound cars were both run on the north-bound track. How long before the accident the custom had been departed from does not appear, except as one witness testified: "This sewer had been digging up Yonkers avenue for some time; quite a few weeks." But it does not follow that the track was obstructed all of that time, if that be material. The deceased lived a mile north of said Harlem station, and there is no evidence that he knew of the temporary change in the manner of running the cars. On the day of the accident he, in company with his daughter, had been to New York shopping, and on returning reached said Harlem station at West Mt. Vernon at about 8 o'clock. Upon alighting from the car at the station the daughter left the deceased standing at the street corner, while she went in search of a carriage to take them home. She found a carriage but a short distance away; but, on returning to the place where she had left her father, was unable to find him. She searched for him in the shops,

where she thought he might be, and not finding him went home. It was a dark, rainy, foggy night. Three hundred feet to the north of the place of accident was a sharp curve in the street. The car which killed the deceased was proceeding south on the north-bound track. Between the curve and the place of the accident it collided with a covered delivery wagon in which two men were riding, which was also being driven south on said track. The occupants of the wagon testify that as the car passed the wagon "it shot ahead," and that the motorman leaned out and said something to them which they did not understand. At that point they both saw the deceased on the tracks under an electric light ahead. They describe what they saw as a dark object, which they evidently understood to be a person, because they say they could not distinguish whether it was a man or a woman, and they seem to have been unable to state whether the person was moving or standing still. They observed that, when the car got to where they had observed this person, it suddenly stopped, and when they reached the point they found the body of the deceased on the track a few feet in the rear of the car. Blood and flesh were found on the track for a distance of 20 feet back of where the body lay. No signal was sounded on the car from the time it passed the delivery wagon to the time of the accident. During that time the car was running fast.

There is no question respecting the negligence of the motorman. Indeed, it would seem that his negligence was gross; for, although running a car contrary to custom, where he must be presumed to have known that pedestrians were in the habit of walking, he ran down the deceased without even giving him a signal to get off the track, although by reason of the arc light directly over him he was plainly visible. There is evidence that there was a headlight on the rear of the car. It does not appear whether there was one in front. The evident altercation with the driver of the wagon, with which the motorman had just collided, accounts for the fact that he neither saw nor warned the deceased.

While the law is settled in this state that there is no presumption that the deceased was careful, there is a presumption that he did not commit suicide, and we may start with the inference that he neither saw nor heard the approaching car. From that inference, together with the fact that when last seen, a half hour earlier, he was at the Harlem station, a half mile north of where he was killed, an inference may be drawn that he was proceeding south at the time he was struck. It may be presumed that he knew the custom of the defendant to run only north-bound cars on the east track. Indeed, even a stranger in the locality would assume that from general custom. The deceased lived a mile and a half from the scene of the accident, and there is nothing in the record to show that he knew of the obstruction on the south-bound track, or that the south-bound cars were temporarily running upon the other track. The plaintiff was not bound to show that he was ignorant of the temporary change; for, in the absence of any proof on the subject, that will be presumed. The party asserting the fact would

have to prove that he had knowledge of a departure from custom. We have it established, then, for the purposes of the question under consideration, that he was walking south where pedestrains were accustomed to walk on the north-bound track, and that he supposed no car would come upon him from behind. He was not a trespasser, but was on a public highway, where he had a right to be.

The rule requiring a person traveling on or crossing railroad tracks to stop, look, and listen has no application to the case. The deceased was only bound to exercise the care of an ordinarily prudent person, and it was for the jury to say what care, if any, he should have exercised, under the circumstances disclosed, to guard against the unexpected danger of a car coming upon him from behind, and whether, in the exercise of that care, he should have discovered and avoided the danger. He was not bound as matter of law to do any specific thing to discover what he had no reason to expect. A jury might say that an ordinarily prudent person, in the situation disclosed, would rely on seeing a car approaching from the front, and would not be apt to see or hear one approaching from the rear in time to escape it, especially in the absence of any warning of its approach. If the deceased were alive, and in a suit for his injuries should testify that he supposed no car would come upon him from behind, and that he was looking out for cars approaching in front, but neither looked nor listened to discover a car from the rear, he could not be nonsuited; and surely that hypothesis is the most adverse to the plaintiff of any that can be assumed. To be sure, the movements of the deceased during the half hour preceding the accident are not accounted for, and it may seem strange that he should have left the place where he expected his daughter to return to him, and be found a half hour later going in the opposite direction from his house; but we are not concerned about his movements or the motives for his conduct during that half hour. However he came to be where he was, he had a right to be there, and the defendant had no right to run him down. As the permissible inferences from the facts shown present a situation which did not call upon him as matter of law to observe any special care to discover the particular danger impending, the case was for the jury.

It does not seem profitable to discuss general principles or distinguish the decision in this class of cases. The general rules of law are well settled; the only difficulty being in applying them to particular facts. For cases somewhat similar, see Beecher v. Long Island R. R. Co., 35 App. Div. 292, 55 N. Y. Supp. 23, Id., 161 N. Y. 222, 55 N. E. 899, and Loder v. Metropolitan Street R. Co., 84 App. Div. 591, 82 N. Y. Supp. 957; and for cases in which the general principles are discussed and the cases bearing upon them collated, see Noble v. N. Y. Central & H. R. R. R. Co., 20 App. Div. 40, 46 N. Y. Supp. 645, Pruey v. N. Y. Central & H. R. R. R. Co., 41 App. Div. 158, 58 N. Y. Supp. 797, Id., 166 N. Y. 616, 59 N. E. 1129, and Monck v. Brooklyn Heights R. R. Co., 97 App.

Div. 447, 90 N. Y. Supp. 818; Id., 182 N. Y. 567, 75 N. E. 1131. The judgment should be reversed.

Judgment and order reversed, and new trial granted; costs to abide the event. All concur.